We have three cases on the calendar this morning. Three patent cases, two from the TTAB and one from the District Court. But before we get to that, we have a bar admission, which is always a pleasant event for that. And I will ask Dr. O'Malley to make a motion. Yes, I move the admission of Allison Schmidt, who is a member of the bar and is in good standing with the highest court of California. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. In fact, I have unique knowledge of her credentials. It seems like every time that I move the admission of a law clerk, I'm moving the admission of someone far smarter than I am to this court. Allison went to the University of Washington in Seattle, double majored BS in chemistry, BS in biochemistry. I like the minor in history, that helps. And then she went to Duke to get her PhD in chemistry and then she went to Berkeley for law school where she hit the cover off the ball. And now she's been with me for 18 months where she has not just been brilliant in all ways, but has been a charming and witty and fun person to have in chambers. So I am very pleased to move Allison's admission to the bar. Well, as a Berkeley grad, I'll sure support that. The motion is granted. Would you step forward and take the oath, please? I take the oath. Do you solemnly swear or affirm that you will report yourself as attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the Department of the United States Court of Appeals. Welcome, Ms. Schmidt. Our first case is Raytheon v. Sony and Samsung, 2017-15, 54, 56, and 57. Mr. Olenda, good morning. Good morning, Your Honor. Before we get started, I wanted to caution the court that we are subject to international traffic and arms regulations requirements. And for that reason, we wanted to flag for you that we should avoid disclosing ITAR materials inadvertently. And there's only really one area that that possibly could come up. And I just wanted to direct your attention to appendix page 241. And the structure is talked quite a bit about this structure in the respective briefing. And so just for purposes of brevity, we'll call it figure two, given the fact that these codes are highly confidential. And the bottom portion of this structure, we'll just refer to the CRC readout, as opposed to the CRC numerical designation there. And globally, we'll call this the hybridized structure. Good morning, Your Honors. May it please the court. Approving a reduction to practice in this case should have been straightforward. The credibility of Raytheon's inventors and experts were not challenged by the board or by Sony. And the veracity and reliability of the corroborating evidence, particularly the 1991 IRAD, were never challenged. Yes, but the IRAD itself talks about an intended structure. And the board found that that reflected a conception rather than a reduction to practice. Your Honor, there are several problems with that. And the first one is a legal one, which is that under the rule of reason, the starting point is the inventor testimony. Because remember that in approving reduction to practice here, we did not rely on documentary evidence alone. We relied on the inventor testimony corroborated by the documentary evidence. And here, the testimony was unchallenged and indicated that the hybridization structure was unmade. There was no credibility challenge to these expert The board didn't make a finding to say that the experts were not credible. But what the board did find, did it not, was that the IRAD actually said in there that certain things were planned for later, later years, and the inventors couldn't really clarify whether a particular limitation had been reduced to practice. So it wasn't a question of them saying that you had to corroborate the corroboration or even saying that the inventors weren't credible. It was just saying that there was some conflicting evidence and the inventors evidence didn't fill in all the gaps. So keep in mind that we're only contesting, there's only one limitation that's at issue. Three of the four main process limitations here, there's no dispute about them. So effectively what we've been required to do is to prove reduction of practice twice. One through our inventors and second through our corroborating evidence. Did the inventors clearly state that that final limitation was reduced to 100%? And I guess just to answer your first question about this intended structure, this really leads to the second rule of reason error, which is we look at this corroborating evidence as a whole. So if we go to the 1991 IRAD, and I'm going to point you to page 241, there's several things I'd like to note. First, is that the term was is used twice. The past tense, first above the figure two structure we were just speaking about, where it says this approach towards demonstrating the TEM concept was embodied in the CRC 559 readout design. Secondly, on the left column it says our intent was to accomplish a rapid mechanical demonstration of the TEM concept. So they used the past tense twice. Then if we go back to the abstract of this IRAD document, which is appendix 238, there's a very important quote here. And this is in the last paragraph, and I'm going to have to paraphrase here. It says, CRC, numerical designation, lot one completed processing in late 1990. That's a crucial sentence in this abstract of the IRAD on page 238, last paragraph, about four or five lines down. Without completing the hybridization structure, the hybridization testing couldn't have been done, and therefore the processing of the CRC readout could not have been completed. That was a necessary condition for that. Is there any technical reason why Lou's method can't be used for optical sensors, not pointed at stars? I'm sorry, can you please repeat that? Sure. In the red brief at 35, Sony argues, the claims of the Lou patent do not recite the star sensor application. And Raytheon puts forward no technical reason why Lou's method cannot be used to make devices for optical sensors, not pointed at stars. Is there any technical reason? Okay, so we're talking about two separate arguments here. So the first had to do with the specific application of star sensors, which is an issue we're not appealing. That is one aspect of the teaching way position that we are making. The other aspect of this, which is much more general than just simply star sensors, is that two of the main objects of the six, two of the six objects could not have been accomplished using a silicon. Right, but do you have to accomplish all of the goals of the prior art in order for there not to be teaching away? In other words, if Lou says, okay, these two applications won't work, but doesn't otherwise teach away from use in a whole host of different applications, doesn't that mean that essentially it's not really teaching away, it's just saying that it's less efficient? Well, let's step back. Perhaps with respect to the hampering argument, that may be true, and we're not appealing that. But with respect to the general objects of the invention, and keep in mind what Lou is about, Lou is a complete departure from the prior art, and somebody admits that on page 29 of their brief and in the oral hearing. Lou says, don't use silicon in the beginning of this disclosure, and then talks about gallium arsenide for the rest of it. So yes, there was lots of work done in the silicon area, but this was a real departure from that, and that's why it's so important that two of these objects could not be accomplished if you use a silicon. Because keep in mind that under the Gordon case, which is really what's controlling here, if these CCDs are inoperable, that is a textbook teaching away, and that's exactly what we have here. These two objects apply to the entire patent. But when you say inoperable, I guess the argument on the other side is it's not inoperable for all purposes. It's only inoperable for the two key purposes that Lou was looking to. But it doesn't say it would be inoperable for all other purposes. Well, two key objects of the six in the whole, in the entire patent, I see that's fairly substantial. And in fact, if you look at the oral hearing transcript, I should point out after distinguishing Lou as not a non-silicon reference, and I'm quoting from my opposing counsel, a person of skill in the art is not an automaton. They can see past that minor application point to the minimization of gate obscuration. Gate obscuration is yet a third object of this invention that could not be accomplished. Now, he tried to minimize that at the oral hearing, but now we're at three of the six objects of the invention. That to me is a substantial teaching away. This isn't a mere hampering or diminishment of one particular application as for star sensors. Counsel, I want to ask you about, you're arguing that there has to be a second substrate in the claim. Yes, Your Honor. And the board found that nothing precludes an additional step removing the second substrate. That's what you're arguing is unsound. That may be true if we just ignore the specification. And this law, starting from Vitronics, Medrad, there's a legion of cases that say when you're looking at the plain meaning of the claim language, you don't ignore the specification in prosecution history. In this case, the specification. There are good reasons for that, because when you look at the specification, it helps you understand what the invention is and what its fundamental features are. And if we look at what the fundamental features are here, in column three, the inventors talk about the fact that these fragile devices are passed back and forth as part of the fabrication process. They're very thin, fragile, and can easily be destroyed. So when you put the second substrate on top, that's how they solve that. They permanently affix it to make sure that that's protected. That's how they solve the problem. And that's the reason why the only embodiment disclosed in this patent is where there's a permanent affixing of that second substrate on top of this device. So now we've shifted into the Morimoto discussion. Correct, Your Honor. I keep jumping you around. I'm sorry. That's okay. So for Liu, in order to agree with you, I mean, there's one part of your argument that I find a little bit difficult and where it seems that you're divorcing teaching away from the question of motivation to combine, but it really is that the former informs the latter, right? So they're not two different inquiries. They're related concepts, but why would one be motivated to combine a reference such as Liu that says, my objects won't be accomplished if we use silicon. In fact, my whole disclosure says we're not using silicon. Gallium arsenide is where we're at. We're in a very small part of the world because, as counsel pointed out, everybody was using silicon, so we're very different. Right, but the whole point of teaching away is to say that therefore, even if it might otherwise look on its face like there would be a reason to combine it, there wouldn't be a motivation to combine because of the teaching away. Correct. I mean, they're related concepts. I would certainly agree with you, Your Honor. I'd like to direct your attention to the ONR white paper, which you mentioned in passing footnotes in the blue brief and saying it's cumulative, and somebody comes back and says, no, it supports our position. Do you agree with them that it does? I would have to disagree with that, Your Honor, because keep in mind that there were a lot of moving parts in this case, and we wanted to distill this down to make this as simple as possible to the extent that we could. The 1990 invention disclosure and that white paper, both of them, keep in mind that before, down below, there were two issues that we were dealing with, one of which was conception, diligence, and reduction of practice, and then, in this case, just a pure reduction of practice is what we're arguing now, just an actual reduction. Those two things, the invention disclosure and the white paper, were very supportive of the conception piece of that, but with respect to the actual reduction of practice, the IRAD is really where that's at. So those are supporting documents for us, but in terms of what we actually did, the IRAD is where that is, and that's why we limited the scope of the evidence we were relying upon. We can save the remainder of your time for you. I'd be happy to, Your Honor. Mr. Smith. Thank you, Judge Lurie. Matthew Smith, Smith-Palooch LLP, representing SEMI, although I will speak for all of the appellees today. Let me begin with the second substrate argument. I heard Mr. Melendez say that we can't ignore the specification, and of course we can't do that, but this isn't a dispute about plain meaning on the one side and specification on the other. Specification supports Sony's position. First, it doesn't say what Raytheon wants it to say, which is there's no express statement anywhere in the specification that the second substrate has to be part of the complete device. But it does. One of the actual claimed limitations is a second substrate. So how do you say that just because you used the word comprising? Under your theory, you could use the word comprising, and you could take away every aspect of the claimed invention. That doesn't make any sense to me. Right, and this is essentially the dip and dots argument, and I think it's correct to say... It's also common sense. Okay. Have you ever had a case, can you cite a case where an express limitation of a claim was that could have also include something that negated that express limitation? I certainly can't cite a case, but that's not this case as well. It's counterintuitive. Because the Morimoto reference has a second substrate. The question is, does Morimoto disclose the second substrate being part of the complete device? And there's actually a little bit of an ambiguity in that construction as to what the complete device is. If it's just the output of the basic method of claim one, furnishing, forming, attaching, etching, Morimoto discloses that. That's figure 1C of Morimoto. That doesn't distinguish Morimoto at all. Now, Raytheon, in its original brief, did not explain how its construction would distinguish Morimoto. In the reply, what they said was, and this is at the bottom of page five, quite simply, Morimoto fails to disclose the step of attaching the wafer to the second substrate, because Morimoto requires, quote, removing the supporting silicon substrate, the alleged second substrate, such that the substrate is no longer part of the complete device. So Raytheon is saying, in Morimoto, it is part of the complete device, but then it can be removed later. And I think what this means is that Raytheon's actual claim construction position is not that the second substrate is part of the complete device, period, but that the second substrate is part of the complete device with a time limitation, like during its useful lifetime, or something like that. Well, isn't it true that every embodiment in the specification includes the second substrate intact in the final device? In the final device, Your Honor, it is true that you can see embodiments in the patent that end those four steps, and the second substrate is there. And I don't think there's a counterexample to that. But there are teachings in the patent that indicate the opposite. And this is, I'm thinking of column five, lines 30 to 31, where there's a teaching about the method of attachment, and that the second substrate, 58, can be attached with any appropriate technique. And then the specification goes on to say that in one particular technique, which gives a permanent attachment, and it talks about epoxy and degassing and curing. So you have this initial statement that any appropriate technique could be used, and then there's one specific example that renders a permanent attachment, meaning it couldn't be removed after that. So among the universe of techniques that one could use, many of those are not going to be permanent. And in fact, the one technique that the specification says is permanent is separately claimed in claims eight and 18. So one would expect the independent claims to be broader than that. Mauritian has a sort of functional argument, an engineering argument, if you will, that you can't remove the second substrate because there wouldn't be enough mechanical stability for the thin wafer. And that's an argument that's only valid during the process of fabrication. You can remove the second substrate as long as there is some sort of other support for the wafer. And as a good example of this, initially the support for the wafer is the etchable layer that's recited in the claims. And Raytheon removes, or the 678 patent removes the etchable layer once the second substrate is attached, so once there's other mechanical stability. Right. But in Morimoto, the second, how is the second substrate layer removed? Ultimately, it is removed, and I don't think Morimoto says the exact manner in which it is removed, Judge O'Malley, but it's not removed at the point in time which is the output of the claims, which I think literally Raytheon's construction is saying is the complete device. In the blue brief, Raytheon argues that, regarding the experts, that the only thing resembling a question about the two doctors' credibility is when Sony merely invited the PTAB to review Mr. Bendick's transcript in its entirety for that purpose. Why shouldn't we find that you waived any challenges to those two doctors' credibility? So, Your Honor, this is, of course, on the question of reduction to practice for the Berkman reference, and I think the notion that Sony didn't challenge the credibility of the Raytheon witnesses, and I'm talking to both the inventors and Dr. Buckman's testimony, is a little bit mysterious to me, because what Sony did below, and the board ultimately agreed to this, is to say that the inventors' deposition testimony contradicts their original declaration testimony, and also the 1991 document that Raytheon is relying on, this IRAD, contradicts the inventors' original declaration testimony. So what precisely did they say in their deposition that was different than the declaration? So on Mr. Finola, for example, on appendix page 577, testified in answer to what I think is a very straightforward question in this context. Did you verify that all elements of the claims were used in the process that they're claiming for the reduction to practice? And he said, no, we did this at various times, it's not necessarily a single device that demonstrates all of this stuff. And then 20 transcript pages later, on appendix page 597, he says, remember, it's not a single device for all of this. That contradicts his original declaration testimony, and I'm not implying anything nefarious. I'm not sure how that contradicts it. I mean, he said that we ultimately performed all the steps. Here he's saying that we divided into various pieces, and they were performed at various times, the sum of which constitute the reduction to practice. But he's not saying that any of those times post-dated the critical date. Judge O'Malley, I think the critical point there is the different devices, because in the original declaration, he makes the case that there is an October 1990 reduction to practice tied to a specific chip with a CRC designation. And what comes out in the deposition transcript is that that's not necessarily true, that there are different steps being performed to make different devices, and those are being combined to construct a reduction to practice case. And that lowered the credibility of the original declaration. That doesn't seem like an inconsistent statement to me at all. I mean, if I were sitting in district court, I wouldn't even let you use it to impeach, because it's not inconsistent. You never did it. There weren't follow-up questions to get to exactly the point you're trying to make. Well, certainly the original question, I think on appendix page 577, was whether or not he had verified that all steps of the claim were used to produce that reduction to practice device. And the answer to that was no, it was not necessarily any one device that showed all of these things. And the board, I think, relied on that as a point which undermined the credibility of the original declarations, but also in combination with what the 1991 IRAD document said. And the 1991 IRAD document, remember, had a specific date for its completion, which was early 1991, talking about events through 1990. So while it was being written, it was several months after the reduction to practice date. Dr. Buckman, Raytheon's witness, relied on that figure 2 on appendix page 241, which Mr. Melinda referred to. And the figure 2 at the bottom has a substrate, which he said was the second substrate. Let me go back to Liu. If, in fact, it's true that Liu actually says that three of its purposes cannot be satisfied with a silicon chip or use of silicon in this process, why isn't that enough to make it clear that there would not be a motivation? Yeah, so first of all, Judge O'Malley, it's not true that Liu says that. Liu says only what is in the second paragraph of Liu, that silicon can hamper certain applications. But second of all, the reason it doesn't matter is because the combination that was put forward was not modifying Liu to achieve Liu's purpose. It was taking the method of Liu, which produces a backside illuminated device, and applying that to the many known purposes already usable for silicon-based devices. So we have this background that the devices of this type, which are CCDs, just image sensors basically, are in an industry that is dominated by silicon-based devices. But in terms of analyzing teaching way, we're supposed to look at the purposes of the prior art, right? Yes. We are supposed to look at the purposes of the prior art, but we're talking about a different prior art purpose. In other words, Sony never advocated, and the board didn't find, that a person of ordinary skill in the art would use silicon with Liu to fulfill Liu's purposes. What the board found was that a person of ordinary skill in the art would have known of other applications that were appropriate for silicon-based devices, and would have used Liu's method to make those devices for those purposes. And that's perfectly acceptable under the case law, right? That is the quote from KSR that we have in our brief, where the Supreme Court said, you can't just look at the prior art, Asano's purpose. You can look at the technology in there. And if there's motivation to do it, of course, you have to get past that step. But if there's motivation to do it, you're not, as a matter of law, tied to the purpose of a primary reference or even a secondary reference. You just have to explain why a person of ordinary skill would have had motivation to do what they did. And the board did that on appendix page 81, referring to specifically Dr. Blanchard's testimony at appendix pages 10573 and 10575, paragraphs 184 through 187, where he laid out very clearly why a person of ordinary skill in the art would have done that. First of all, they would have known that there were other applications in the field for silicon-based devices. And that's not disputed by Raytheon. You heard Mr. Melendez say that, and that's also clear in the briefs.  That they were cheaper, faster, easier to make. That's in paragraph 187. And that Lew itself, at the end, suggests that other semiconductors can be used for different kinds of applications. So all of that taken together, I think, is substantial evidence for the board overall finding motivation to combine and rejecting the original teaching away argument that even we agree that Raytheon made, albeit in a cursory fashion in the Pat Manor response, which was simply based on this hampering language in the second paragraph of Lew reference. So overall, the board, in addressing that original teaching away argument, adopted a motivation to combine that was not based on Lew's purposes, but was based on purposes that a person of ordinary skill in the art would have known based on the dominant technology in the industry. None of that is disputed by Raytheon on appeal. And those fact findings, supported by substantial evidence, I think support the board's judgment in this respect. I'd also like to correct, I think, Mr. Melendez's quotation of the oral argument transcript below, where he talked about gate obscuration. Gate obscuration arises from the normal method of processing. It is cured by the four-step method that is disclosed in Lew, which the board found anticipated, not only the independent claims, but some of the dependent claims as well. Not disputed, again, by Raytheon on appeal. And that method has nothing to do with a particular semiconductor type that's used. That's actually an advantage that one gets from using Lew in other semiconductor types, including silicon. So that's simply not correct to say that Lew's purpose there is frustrated by the semiconductor type. What's really driving that is the method steps of furnishing, forming, attaching, etching, as Lew does identically with the 678 patent. And I think overall, Raytheon is simply arguing the wrong standard on appeal. The board made factual findings that are amply supported by substantial evidence, including the record of the corroboration evidence that Raytheon put forward itself in the Bertin issue, and the record evidence in the form of the prior art, and the declarations of the experts that were submitted by Sony and the cross-examination testimony. And that's enough to sustain the board's judgment whether or not Raytheon on appeal now believes that there's some factual issue, which you should decide to know. But that's not the right standard, and so you should affirm the board's judgment. Thank you. Thank you, Mr. Smith. Mr. Melinda has some rebuttal time. Mr. Melinda. Yes, sir. I'd like you to address a concern of mine, and that's the question of waiver. In its preliminary response, Raytheon made its second substrate argument, and the PTEP rejected it, and in the institution decision cautioned Raytheon that if patent arguments, if arguments weren't raised. Despite that express warning, Raytheon only included a footnote. How do you get passed? So, Your Honor, several things. First, the board addressed this issue in its final written decision. Well, first it addressed it in the initial decision, addressed the claim construction issue, basically replicated that erroneous reasoning in its final written decision. And so we raised it in the preliminary response. We raised it in a footnote in the patent owner response, and then again an oral argument. Right. But oral argument isn't enough under the law. Well, Your Honor, then the board said in its final written decision that basically on a complete record that it was able to construe the claims. So, Your Honor, I think the record was fully developed, and the parties had their opportunity to give their arguments. I mean, we gave ours on at least two or three occasions. They were arguing a plain meaning, and the board had an adequate record to make that decision. So we don't believe there's any waiver there, Your Honor. Right. I guess I'd just like to, on the second substrate issue quickly, Judge Lurie, I would agree with you that this does defy common sense, this construction. And I would just direct your attention to Column 5 just to reinforce that. In Column 5, there's a distinction between the temporary support that is attached on top of the second substrate that protects it when the etching process occurs on the bottom, and the word temporary is used twice in that context. So that's removed in distinction from the permanent affixing of the second substrate to the remainder of the device. So that's an important distinction to be aware of. With respect to Morimoto and what it discloses, there are two important points to take home. One is that this is a four-step process in Morimoto. On Step 3, the second substrate is removed. It's not permanently affixed. And then on the fourth step, a cap is essentially placed on the bottom of it. That's two important distinctions from our invention, the first of which is that we're all about the backside processing. You can't do backside processing in the Morimoto reference because it's capped. And, of course, secondly, there's the removal of that second substrate, which, of course, we don't do because it's permanently affixed. With respect to reduction of practice, I would agree with Your Honor about any sort of contradiction. There's no contradiction in this testimony. I think these were intentionally generalized questions. They were not focused on particular claims or particular claim limitations. And that's important because all they really wanted was a sound bite of very general nature. And I should also point out the fact that it's not inconsistent that there could be multiple devices that embody the claimed invention. So we don't believe that there's any tension there. And in terms of waiver, the issue you raised, Judge Wallach, I should point out the fact that with respect to the credibility of the inventors, I wholeheartedly agree that it was waived. And also I should point out that underscores the unfairness of this decision because you have unchallenged inventor testimony coupled with no responsive rebuttal by an expert. They had no expert. And then lastly, with respect to teaching away, I would just summarize by saying that it's important to focus on what the Liu reference teaches, which is something very different than all the rest of the art was teaching. And the board never addressed this objects of the invention argument under Enright Gordon. And you should remand for them to do that. Thank you, Mr. Melendo. We'll take the case under advisement.